U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION

------------------------------------x
IN RE                               :
                                    :
SONG PARK AND YONGDAE PARK          : Chapter 7 Case Nos.
                                    :
                                    : 1-11-40745-cec, 1-11-40747-cec
                                    :
Debtors.                            :
                                    : (Jointly Administered)
                                    :
------------------------------------x

## DEBTOR YONGDAE PARK'S MEMORANDUM OF LAW

LAW OFFICES OF N.M. GEHI, P.C.
Naresh M. Gehi, Esq.
The Pickman Building
118-21 Queens Blvd., Suite 411
Forest Hills, N.Y. 11375
Telephone: 718-263-5999

Counsel to Debtor Yongdae Park

## FACTUAL AND PROCEDURAL BACKGROUND

On February 1, 2011 (the "**Petition Date**"), debtor Yongdae Park ("**Mr. Park**") commenced a voluntary case under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**"). On the same day, Mr. Park's daughter, debtor Song Park ("**Ms. Park**"), also commenced a voluntary chapter 7 action.

As sworn to by Mr. Park in the attached affidavit, the events leading to this action began when Ms. Park purchased a pet grooming business in June 2006. See Exhibit A, Affidavit of Yongdae Park, at paragraph 4. The business was called SP Puppy Love, Inc. Ms. Park was twenty-five years old when she purchased the business and had never bought or managed a business prior to that time. See id. at 5-6. The person who sold the business to Ms. Park was Ji-Sun Lee ("**Ms. Lee**"), who pressured her to purchase the business despite the fact that Ms. Park lacked the financial means to do so. See id. Ms. Lee insisted that Ms. Park buy the business, and Ms. Lee devised a scheme for Ms. Park to secure the financing. See id. The scheme involved making Ms. Park's parents officers of Ms. Lee's own separate business, JS Puppy Land, Inc., and leading them to apply for loans from HSBC, Washington Mutual, and TD Bank. See id.

Ms. Park operated the business to the best of her ability and showed a profit of $973.00 in 2007. See id. at 8. However, she was unable to keep up with the monthly payments owed to Ms. Lee and was only able to make minimum payments toward her father's loans from HSBC and Washington Mutual. See id. at 7. In 2008, Ms. Park incurred losses and her business shut down. See id. at 8.

Ms. Park became so distraught over her inability to pay the debts that she attempted to commit suicide. See id. at 8. Mr. Park leased a different office space and incorporated a new

business, called Parks Doggi Mama, Inc. It has been operating since 2009, although with great difficulty. See id. at 9. Despite Mr. Park's best efforts, his business failed to generate enough revenue to make the payments owed to Ms. Lee, HSBC, and Washington Mutual. See id. at 9. As a result, Ms. Park and Mr. Park felt forced to file for bankruptcy.

A section 341 meeting of creditors was held on March 8, 2011. At that meeting, Trustee Robert L. Geltzer ("**Trustee Geltzer**") requested additional documents from Ms. Park and Mr. Park, and granted them additional time to submit these documents. However, Trustee Geltzer failed to clarify which specific additional documents were required. He did not provide to Mr. Park a complete list of the needed documents. On April 8, 2011, Trustee Geltzer sent Mr. Park's counsel a letter requesting books and records for the business. On April 11, 2011 Mr. Park filed a motion for an extension of time to submit documents. On April 12, 2011, a second section 341 meeting was held. At this meeting, Mr. Park received another extension of time to submit documents.

Mr. Park is now providing a detailed affidavit regarding the businesses involved in the above-captioned cases. See Exhibit A. He is also submitting to Trustee Geltzer bank statements regarding Parks Doggi Mama, Inc.

## ARGUMENT

### I. MR. PARK'S INABILITY TO PROVIDE FULLY COMPREHENSIVE BOOKS AND RECORDS FOR HIS BUSINESS SHOULD NOT BAR HIM FROM RECEIVING A DISCHARGE.

Mr. Park should not be barred from receiving a discharge on account of his inability to produce detailed books and records of her business. A debtor may be granted a discharge even if he cannot produce books and records of his business, if he can demonstrate that his lack of books and records is justified. In re Yerushalmi, 393 B.R. 288, 297 (Bankr. E.D.N.Y. 2008). To

determine whether a debtor's lack of books and records is justified, courts evaluate whether the absence of records is reasonable given the debtor's particular circumstances. In re Underhill, 82 F.2d 258, 259-60 (2d Cir. 1936); Meridian Bank v. Alten, 958 F.2d 1226 (3d Cir. 1992). It is a "loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved." Morris Plan Indus. Bank of N.Y. v. Dreher, 144 F.2d 60, 61 (2d Cir. 1944). As discussed below, the education, experiences, and knowledge Mr. Park had, the difficulties he faced, and his lack of a fraudulent intent justify the absence of complete books and records for his business.

### A. MR. PARK'S LACK OF FINANCIAL SOPHISTICATION JUSTIFIES THE ABSENCE OF BUSINESS BOOKS AND RECORDS

In evaluating whether the absence of books and records is justified, key factors to consider are the debtor's education, experience, and sophistication. See In re Moreo, No. 07-71258-dte, 2008 Bankr. LEXIS 3252 (Bankr. E.D.N.Y. Dec. 1, 2008); In re DeRise, 394 B.R. 677, 688 (Bankr. E.D.N.Y. 2008) (quoting Meridian Bank v. Alten, 958 F.2d 1226, 1231 (3d Cir. 1992). To determine a debtor's level of sophistication, courts have considered the debtor's education and knowledge of business affairs. In re Smorto, No. 07-CV-2727 (JFB), 2008 U.S. Dist. LEXIS 19235 (E.D.N.Y. Mar. 12, 2008). In Moreo, the court refused to deny a debtor a discharge for failing to produce books and records for her bagel shop because the debtor only had a high school education, lacked an understanding of proper business accounting, and had no experience apart from working at the shop before she purchased it. 2008 Bankr. LEXIS 3252 at *8. Like the debtor in In re Moreo, Mr. Park had never owned a business before, and he had no business experience. See Exhibit A at 6. Thus, he is an unsophisticated debtor and it is reasonable that he would not know how to maintain detailed business books and records.

## B. MR. PARK'S PERSONAL DIFFICULTIES JUSTIFY THE ABSENCE OF BUSINESS BOOKS AND RECORDS

Mr. Park's personal difficulties also justify his inability to produce books and records. In re DeRise, 394 B.R. at 688-89; see also In re Benningfield, 109 B.R. 291, 293 (Bankr. S.D. Ohio 1989) (finding that medical problems arising from an auto accident justified the debtor's failure to maintain records). In In re DeRise, the court found that a debtor's failure to produce accurate business records was reasonable because she was embroiled in a protracted divorce proceeding and was frustrated over her husband's failure to pay child support on a regular basis. 394 B.R. at 688-89. Here, Mr. Park tried desperately to help his daughter financially with a business that struggled so much that it drove her to attempted suicide. See Exhibit A at 8. Given the stress involved in suddenly being required to assume such responsibilities to assist an ailing family member, Mr. Park cannot reasonably have been expected to maintain comprehensive business records for his own separate business.

## C. MR. PARK'S LACK OF FRAUDULENT INTENT JUSTIFIES THE ABSENCE OF BUSINESS BOOKS AND RECORDS

Mr. Park's inability to maintain comprehensive books and records of his business should not bar his discharge because he was not motivated by an intent to defraud his creditors. Failure to produce business books and records only requires a denial of discharge where the failure results from the debtor's intent to defraud his creditors. Moreo, 2008 Bankr. LEXIS at *8. Case law clearly establishes that a debtor's lack of sophistication tends to "negate the existence of fraudulent intent." Id. (quoting Smorto, 2008 U.S. Dist. LEXIS at *13-15); see also In re Olshan,

312 B.R. 476, 488 (Bankr. E.D.N.Y. 2004). Here, Mr. Park's failure to maintain books and records resulted from his lack of financial sophistication and business experience, not from fraudulent intent. See Exhibit A at 6-7.

I. **TRUSTEE GELTZER SHOULD CONSIDER ALL THE DOCUMENTS AND TESTIMONY PRODUCED BY MR. PARK TO ASSESS THE ADEQUACY OF HIS RECORDS.**

Courts have repeatedly held that a debtor need not justify failure to maintain detailed business books and records unless the creditor or trustee shows that this failure has made it impossible to ascertain the debtor's true financial condition. Yerushalmi, 393 B.R. at 297; DeRise, 394 B.R. at 688; Moreo, 2008 Bankr. LEXIS at *8. To evaluate whether the debtor's financial condition can be ascertained and whether a debtor's inability to produce books and records is justified, courts typically consider all records produced by the debtor, and the debtor's testimony. See DeRise, 394 B.R. at 688-89 (Denial of discharge refused because "[I]nconsistencies, omissions, or misrepresentations between [the debtor's] complete Schedules and her SOFA were largely reconciled by her testimony at the November 2006 trial and an integrated reading of her bankruptcy papers"). Courts have refused a denial of discharge where the trustee is able to proceed with the bankruptcy by evaluating the documents produced. See, e.g. DeRise, 394 B.R. at 684. In light of the approach preferred by the courts, Trustee Geltzer has an obligation to consider Mr. Park's testimony, Ms. Park's testimony, and all the documents they have produced to determine whether the information provided will enable the continuation of the bankruptcy process.

Mr. Park has made every effort to cooperate with Trustee Geltzer. He appeared at both section 341 meetings. He provided Trustee Geltzer with documents including a copy of his

certificate of counseling, copies of his personal and business tax returns for 2009, bank statements for his current account and his closed account, his affidavit of self-employment, and proof of title, insurance and value for his motor vehicle. He is also now providing business bank statements for Parks Doggi Mama, Inc. In addition, he is providing a detailed affidavit containing relevant facts. As Mr. Park is an unsophisticated debtor who cannot reasonably have been expected to maintain comprehensive books and records, Trustee Geltzer should evaluate the information he has provided to determine whether it is sufficient to proceed with the bankruptcy.

## CONCLUSION

For all the foregoing reasons, Mr. Park's inability to produce detailed business books and records should not bar him from receiving a discharge.

_____
LAW OFFICES OF N.M. GEHI, P.C.
Naresh M. Gehi, Esq.
The Pickman Building
118-21 Queens Blvd., Suite 411
Forest Hills, N.Y. 11375
Telephone: 718-263-5999

Counsel to Debtor Yongdae Park

# EXHIBIT A

U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION
---------------------------------------- X
IN RE                                    :
                                         :
SONG PARK AND YONGDAE PARK               : Chapter 7 Case Nos.
                                         :
                                         : 1-11-40745-cec, 1-11-40747-cec
                                         :
Debtors.                                 :
                                         : (Jointly Administered)
                                         :
---------------------------------------- x

## AFFIDAVIT OF YONGDAE PARK

I, Yongdae Park, duly sworn, depose and state under the penalty of perjury:

1. I am a debtor in chapter 7 case number 1-11-40747.

2. There have been two section 341 meetings in my chapter 7 case, one on March 8, 2011 and the second on April 12, 2011.

3. I am submitting this affidavit to provide supporting details regarding the business that my daughter used to own, called SP Puppy Love, Inc., as well as the business that I own, called Parks Doggi Mama, Inc.

4. In June 2006 a business called JS Puppy Land, Inc. transferred its pet supplies, grooming business inventory, and stock to my daughter's business, SP Puppy Love, Inc. The president and sole owner of JS Puppy Land, Inc. was Ms. Ji-Sun Lee. The purchase price was $250,000.00.

5. At the closing, my wife Soon Kong Park and I made two separate payments, one for $40,000.00 in cash and another for $60,000.00 by check. Both payments were made to Ji-Sun Lee as a representative for JS Puppy Land, Inc.

6. My daughter was only 25 years old at the time and had never bought a business or had enough funds to purchase a business, and Ji-Sun Lee pressured our family into a plan to obtain the finances. Ms. Lee pressured me to become an officer of JS Puppy Land so that I

could obtain bank loans under the name of JS Puppy Land and then use the loan money to develop SP Puppy Love. In addition, Ji-Sun Lee pressured my wife to become an officer of JS Puppy Land in order to obtain a $50,000.00 loan from TD Bank for the development of SP Puppy Love. My whole family felt forced into this arrangement by Ji-Sun Lee, and we believed that there was nothing else we could do.

7. The purchase agreement provides for an owner mortgage in the amount of $150,000.00 that SP Puppy Love would owe to JS Puppy Land. My wife, my daughter, and I ensured that monthly payments were made to Ji-Sun Lee as a representative of JS Puppy Land. My daughter worked long hours and tried to continue monthly payments to Ji-Sun Lee in the amount of $3,500.00 in accordance with agreement. After the first year, we were not able to keep up with the monthly payments of $3,500.00 to Ji-Sun Lee. My daughter Song started making reduced monthly payments of $500.00 to her for another year. Additionally, during that same year Song made minimum monthly payments to HSBC and Washington Mutual to help pay off the loans that I had obtained. My wife used money she had received from her mother's will to pay off the $50,000.00 TD Bank loan over the course of two years of monthly payments.

8. Song tried her very best to run SP Puppy Love, and in the first year she made a small profit of $973.00. However in the second year, July 1, 2007 through June 30, 2008, she started incurring serious losses and suffered a net loss of $481.00, as shown in business records she submitted to the trustee. As also shown in business records submitted to the trustee, from July 1, 2008 through September 2008, when the business stopped operating, there was a net loss of $544.00. As a result of this, she was unable to continue running the business. She was so distraught that she tried to commit suicide due to the pressure and the losses she was sustaining.

9. Since she closed down the business, the owner of the business next door to her, a veterinarian, was very sad to see her situation and its impact on our family. He offered to

sublet his office space to me, and I began operating a pet grooming business in that space. Upon the advice of an accountant, I incorporated my business. The corporation is called Parks Doggi Mama, Inc. It was incorporated in September 2009 and continues to operate currently, although with great difficulty. For example, as shown in some of the business records I submitted to the trustee, from September 21, 2009 through August 31, 2010, the business suffered a net loss of $2,024.00.

10. Our entire family has lost a great deal in our attempts to keep our businesses afloat.

11. At this stage, my family and I cannot even afford to pay rent for an apartment, and we are being helped by my daughter's boyfriend Douglas Gray, who has been extremely kind to accommodate us during the worst financial time of our lives.

As demonstrated above, I am offering everything I can provide in response to the Trustee's request.

Respectfully,                                Sworn to before me this 21st day of April, 2011.

_____                    _____
Yongdae Park                                 Notary Public

NARESH MENGHRAJ GEHI
Notary Public, State of New York
No. 02GE6063117
Qualified in Nassau County
Commission Expires August 27, 2013